No. 15,956.

THACH *v.* DURHAM.
(208 P. [2d] 1159)

Decided July 11, 1949.

Messrs. CORLETT & CORLETT, for plaintiff in error.

Mr. SAM T. TAYLOR, for defendant in error.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

THACH made written agreement with Durham for sale of sheep and received a cash down payment thereon. Durham brought this action, alleging refusal by Thach to deliver the sheep in accordance with their contract and resultant damage, including expenses incurred and loss of profits under agreements which he had made for resale of the sheep. The prayer was for recovery of the damages alleged and refund of the down payment. Thach by answer alleged willingness and ability on his part at all times to perform and the refusal of plaintiff to perform; the fall of market price; inability to sell, and damage in the amount of the down payment, together with special damages, consisting of expenses incurred by reason of plaintiff's breach of the contract, and loss and injury through separation of the young lambs from their

mothers in driving and shipment altogether in excess of the amount of the down payment. The court found inter alia that the specific language of the contract "1550 head of ewes" could not be varied by parole testimony and that the contract called for the delivery of exactly 1550 head of ewes; that there was no provision in the contract that the down payment of $3100 was to be treated as a forfeiture or as liquidated damages; "that the plaintiff had made up his mind prior to the date of June 14, 1946, the date when delivery was to be made by reason of the extension period, to terminate the contract, * * * that the contract was breached by the defendant when the defendant attempted to deliver a greater number of sheep than was called for by the contract, although the plaintiff had theretofore previously marked all of the sheep either as acceptable or as rejected, and made no effort to go to the pens to inspect the sheep, or to ascertain whether or not the sheep he had previously marked were there in the herd, and made no demand for the delivery of the sheep, so marked; * * * that there is insufficient evidence as to whether the plaintiff had made up his mind to terminate the contract a sufficient time before June 14, 1946, to have enabled him to notify the defendant that he would not accept delivery, and consequently only items of damage alleged and proved by the defendant, that arose after the sheep were in the stockyards at Walsenburg, will be considered, and these items of damage are based on the conclusion of the Court that prior to June 14, 1946, the plaintiff had made up his mind not to receive delivery of the sheep and lambs." Pursuant to said findings the court gave judgment to plaintiff in the amount of the down payment of $3100, less the amount of certain of the items of damage claimed and proved by defendant.

The questions brought here for review by specifications and cross specifications are: (1) Which party breached the contract; (2) right to forfeiture of down

payment, and (3) right to recover certain items of damage alleged. Further question is raised by defendant in error as to breach of contract by Thach through alleged delay in making delivery of the sheep. The court found against him on this issue. There is abundant evidence to the effect that the delay was caused by Durham rather than Thach, and in any event Durham waived the default by failure to give notice of recission and by pleading his readiness to receive the sheep up to and including the date of their attempted delivery.

As to breach of the contract: The testimony discloses without substantial contradiction that Thach called Grandbush, who was in the sheep brokerage business at Pueblo, asking if he could sell two bands of ewes and lambs, and Grandbush took Durham to see them at Rattlesnake Buttes where the ewes were then lambing. Durham there made an offer on the sheep and Thach accepted it. They then went to Thach's office at Walsenburg. At his office Thach said there were 1550 ewes and Durham filled in with pencil the blanks on a printed form of agreement which when so filled in, as far as pertinent here, read as follows, except as to the words in italics which were not then included: "This Agreement, Executed in triplicate this 14th day of May, 1946, between Wm. M. Thach of Walsenburg, Colo., hereinafter called 'Seller' and Buck Durham of Billings, Mont., hereinafter called 'Buyer', Witnesseth: For the sum of Thirty one hundred Dollars ($3100) as part purchase price, in hand paid to the Seller, the receipt of which is hereby acknowledged, said Seller hereby sells and conveys and agrees to deliver to the said Buyer, or his order, the following described livestock, and guarantees the title thereto. 1550 head of ewes, lambs at side at $14.00 per head out of wool to be weighed at and delivered, scale count guaranteed, f. o. b. cars at Walsenburg between June 1st & 5th, 1946, at Buyer's option, or as soon thereafter as cars can be furnished by carrier for final destination. *All ewes & lambs to be counted*

*& then divide by 2 to make pairs.* All ewes to have Solid mouths & in good merchantable condition." Thach objected to the contract as so drawn, said that was not their deal, but that all the ewes and lambs were to be counted and divided by two; and then with Durham's consent inserted the italicised words, "All ewes & lambs to be counted & then divide by 2 to make pairs." Durham testified that he did not know whether that was written in before or after it was signed, but there was no argument about it. Some time later, Durham went down to the ranch, had the sheep run through the chute, examined all of them, marked about forty-six ewes with broken mouths and made no objection to any others. Thereafter and before making delivery, Thach asked to have all the rejected sheep cut out at the ranch, but Durham refused and consequently Thach drove all the sheep thirty-five or forty miles to Walsenburg. There Thach and his helpers cut out the ewes which Durham had marked as having broken mouths, separated them from the others and left a gap in the fence so that the lambs belonging to those ewes could get through to their mothers. After the sheep had been put in the corrals at Walsenburg, Durham for the first time raised question as to the number of the sheep included in his contract, insisted that he had purchased exactly 3100 head, and refused to accept the sheep tendered for the sole asserted reason that there were more than 3100 and he had bought only 3100 head. Durham testified, "Q. Now, Mr. Durham, you met there on the 14th down there at stockyards? A. Yes. Q. And at that time you objected to the number of sheep. A. Yes. Q. And Mr. Thach told you there were substantially the 1500 ewes, 1550 ewes, but that you would have to take additional lambs. A. All additional ewes and lambs." Durham also testified that he did not know how many sheep there were; that "Then during the conversation at the yards, Mr. Thach said the contract read, more or less. He says, you going to count all of these ewes and divide

them by two to make pairs? I says, no, Bill, I am going to get the 3100 head out of there and I want the lambs mothered up. You can divide them by two or three, or anything you want to, but I want my 3100 head of sheep." Thereupon, without any attempt to determine the number of ewes actually tendered for delivery, Durham refused to accept the sheep, returned to Pueblo and in his words "give up on the deal." Thereafter Thach shipped the sheep to pasture, kept them through the summer and subsequently sold them.

There is nothing in the contract to support Durham's often repeated contention that he had purchased exactly 3100 head and that exactly that number must be delivered to him. The contract as originally drawn called for 1550 head of ewes, but there is no evidence whatever that he was to select, or that Thach was to select for him, exactly 1550 ewes from a larger number. The evidence is that what Thach offered for sale and what Grandbush showed Durham as being for sale and what Durham purchased were two bands of sheep and that nothing was said about the number until after they had returned to Walsenburg. Further, it is undisputed that after Durham had inserted the words "1550 ewes, lambs at side" in the contract, Thach declared that was not their agreement and with Durham's approval added the words "All ewes & lambs to be counted & then divide by 2 to make pairs." The very fact of Durham's right, which he exercised, to cull out ewes not satisfactory because of broken mouths necessarily made the exact number to be purchased uncertain. Thach was obligated to deliver and Durham to receive all the ewes and lambs in the two bands purchased, excluding those which Durham had marked as rejected for broken mouths, in the absence of showing of actionable misrepresentation as to the number of ewes in the bands.

█ It does not appear from the record that any actual count was made of the ewes tendered by Thach for delivery. Thach testified that there were about 1550.

Durham admitted that Thach told him there were substantially 1550 ewes but that he would have to take all additional ewes and lambs. A neighboring sheepgrower testified that he assisted in counting the sheep and made a tally of the count in connection with loading them the next morning, and that the total number of lambs and ewes was 3498 head; that from his experience in raising sheep he was able to estimate a lamb crop; that he estimated it at around 122% to 123%; that "it was awful good; above the average." Another experienced witness testified that he never saw a better bunch of sheep, lambs and all, and that there were considerable more lambs than there were ewes. On the basis of all this testimony it would appear that after taking out the ewes marked and refused by Durham because of broken mouths there remained approximately 1550 ewes which number he had contracted to buy. Whether under that contract he was required to pay on the basis of the number of ewes or on the basis of the total count of ewes and lambs divided by two is not involved for the reason that he refused to accept the sheep without reference to the price and without checking the number of ewes tendered. Such refusal constituted a breach of the contract by Durham, and thereby he became liable to Thach for such damages as are the natural and proximate result of the breach.

As to the right of forfeiture of down payment where the buyer refuses without cause to perform his contract, no precedent from this jurisdiction has been called to our attention, but the great weight of authority seems to deny the right to recover back the payment where, as here, there is no plea nor proof of mutual rescission.

In *Tomboy Gold and Copper Co. v. Marks,* 185 Calif. 336, 197 Pac. 94, action was brought to recover cash down payment made under an agreement to purchase a milling machine with balance to be payable on delivery, where plaintiff purchaser had declined to accept the

machine or complete payment therefor and demanded back the down payment and defendant had sold the property to another purchaser for the same price plaintiff had agreed to pay. The court there said: "In the absence of a mutual rescission there can be no recovery by the vendee under such circumstances. No rule is more firmly settled with relation to contracts for purchase, whether concerning real or personal property, than that to the effect that a vendee, who without lawful right refuses to go on with his contract, cannot recover from a vendor not in default who is ready and willing to proceed and fulfill all his obligations, all or any of the money that he had paid to the vendor in accord with the terms of the agreement."

In *Gibbons v. Hayden,* 3 Kan. App. 38, 44 Pac. 445, plaintiff sought to recover advance payment on a contract for purchase of hay as well as damages alleged to have resulted from breach of contract by defendant in its failure to tender hay of the quality contracted for. After determination of the issue as to the quality of the hay against plaintiff, he was denied refund of the down payment. Therein the court said, "* * * the rule seems to be well settled that the party who has advanced money in part performance of such an agreement, the other party being ready and willing to perform on his part, cannot, without just cause or excuse, refuse to proceed with the contract and recover back what he has advanced."

In *Foss-Hughes Co. v. Norman,* 32 Del. 108, 119 Atl. 854, the court said: "Here the plaintiff had made a deposit on account of the purchase of a motor vehicle; he did not pay or offer to pay the balance due; he does not desire to complete the purchase and, upon the refusal of the defendant to repay the deposit, has brought suit therefor. There has been no rescission of the contract by the vendor which has at all times held itself ready to comply with the contract by the delivery of the motor car. We have found no case, nor has any been referred

to us by counsel, where under any similar facts recovery has been had."

In the often cited case of *Hansbrough v. Peck* (5 Wall. 497), 72 U. S. 497, 18 L. Ed. 520 (a case involving sale of real estate with provision for forfeiture), the court said: "No rule in respect to the contract is better settled than this: That the party who has advanced money, or done an act in part-performance of the agreement, and then stops short and refuses to proceed to its ultimate conclusion, the other party being ready and willing to proceed and fulfill all his stipulations according to the contract, will not be permitted to recover back what has thus been advanced or done." And in *Witherow v. Witherow*, 16 Ohio 238: "The establishment of such a principle would have a tendency to encourage the violation of contracts—to diminish, in the minds of contracting parties, a sense of the obligation which rests upon them to perform their agreements." See, also, *Clifton v. Willson*, 47 Mont. 305, 132 Pac. 424, involving sale of sheep; *Ellinghouse v. Hansen Packing Co.*, 66 Mont. 444, 213 Pac. 1087, involving sale of cattle; *Neis v. O'Brien*, 12 Wash. 358, 41 Pac. 59, involving hops, where seller resold hops at a profit; *Stevens v. Brown*, 60 Ia. 403, 14 N. W. 735, involving sale of corn; *Lexington Mill & Elevator Co. v. Neuens*, 42 Nebr. 649, 60 N. W. 893, involving sale of wheat, and *Pfeiffer v. Norman*, 22 N. D. 168, 133 N. W. 97.

Williston states the rule: "If after paying a portion of the price the buyer makes default, and the bargain is not carried out, the question arises whether the buyer can recover or get credit for what he has paid. The question does not seem to differ essentially from the similar problem frequently presented in regard to conditional sales. And most courts would probably decide, as they have done in regard to conditional sales, that though the buyer has not received delivery and though, therefore, the bargain is not what is commonly called a

conditional sale, he cannot recover the portion of the price which he has paid even if the seller thereby obtains an undeserved profit. And so far as principles established in courts of law are concerned, it may be said 'that the party who has advanced money, or done an act in part performance of the agreement, and then stops short and refuses to proceed to its ultimate conclusion, the other party being ready and willing to proceed and fulfill all his stipulations according to the contract, will not be permitted to recover back what has thus been advanced or done.' " 2 Williston on Sales (2d ed.), p. 1502, §599j.

Williston states, following the above quotation, that "the application of this principle may involve serious forfeiture, and the application of equitable principles should require, where this is clearly established, an accounting for the excess of what was received by the seller in excess of the damage which he suffered." However, in the only case cited as supporting such rule, the statement is pure dictum. Such a requirement would place on the seller willing to perform his contract the burden of establishing the amount of his damage, which might frequently be uncertain and impossible of accurate determination; it would require him to hold payments received on the purchase price available for refund in case the purchaser tired of his bargain; in brief, it would deprive the seller of the protection which it was the very purpose of the down payment to furnish; it would encourage the violation of contracts and promote litigation. The rule as laid down by the decisions seems to exist independent of any provision in the contract for forfeiture or liquidated damages. It is generally just. Generally a purchaser will not refuse to carry out his contract if the property purchased has a value in excess of the balance due. One who breaks his contract should not be favored over one who takes his loss and faithfully completes performance, nor should he be favored over the other party to the contract who is

willing to perform. In situations where the rule effects injustice;—where equitable grounds of fraud or surprise or unavoidable accident or ignorance, not willful, appeal to the conscience of the court, equity will intervene. None such here appear, and the trial court erred in allowing plaintiff recovery of the down payment.

■ As to recovery of defendant's damages alleged: The right to retain the down payment exists as a compensation for damages and not in addition to damages which may be proved, as urged by plaintiff in error. Except in case where the down payment constitutes agreed and liquidated damages, upon proof that the actual damages are in excess of the amount of the down payment, the amount of such excess may be recovered, but only such excess, and where the damage suffered is less than the amount of the down payment, only the down payment may be recovered.

■ As to the right to recover items of damage denied by the court; no issue was raised in the pleadings as to the legal right of recovery of such damages. Instead, there was denial of the fact of such damages. In view of our resolution of the issues of breach and forfeiture, items of damage alleged by the defendant and supported by evidence should have been considered by the court, whether such damage arose before or after the sheep were in the stockyards at Walsenburg. The court erred in limiting defendant to recovery of damages arising thereafter.

The judgment of the trial court is accordingly reversed and the cause remanded for determination of the amount of the damage of plaintiff in error and judgment thereon not inconsistent herewith.